IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MARK FEY, | ) | |
| | ) | |
| Respondent and | ) | No. 29912-1-III |
| Cross Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| COMMUNITY COLLEGES OF | ) | PUBLISHED OPINION |
| SPOKANE, | ) | |
| | ) | |
| Appellants. | ) | |

SIDDOWAY, J. — Mark Fey sued his employer, the Community Colleges of

Spokane, after it declined to interview him for a grounds crew promotion, citing the fact

that a genetic eye condition prevented him from obtaining a required commercial driver's

license. A jury found in his favor and awarded $7,549 in damages for the college

district's failure to accommodate his disability. The trial court substantially increased the

award by additur. The district appeals.

Although the district assigns error to dozens of trial court rulings, we agree with

its principal contention: the evidence presented by the parties established, as a matter of

law, that it was an essential function of the position to which Mr. Fey asked to be

promoted that he be able to drive commercial weight equipment requiring a commercial

driver's license. Because an employer is not required to modify essential functions of a position to accommodate an employee, the trial court should have granted the district's motion for judgment as a matter of law. We reverse the judgment and remand for dismissal of Mr. Fey's claim.

## FACTS AND PROCEDURAL BACKGROUND

The Community Colleges of Spokane, a community college district, operates two campuses: Spokane Falls Community College, commonly referred to as The Falls, and Spokane Community College, which we will refer to as SCC.[1] Each campus has three employees categorized as "grounds and nursery specialists (GNS)" who are responsible for maintenance needs of campus grounds. During the winter, a primary responsibility of these employees—for simplicity, the grounds crew—is to remove snow and ice from campus streets, parking lots, and sidewalks.

Mark Fey became employed by the district in 2000 as a sprinkler maintenance worker at The Falls—at the time, one of two grounds crew positions at that campus. In 2006, his position was denominated GNS 3, the second most senior position on the grounds crew, with the most senior position being the "grounds lead," or GNS 4. The only licensing conditions of employment identified by the job description for Mr. Fey's

---

[1] The district is created by RCW 28B.50.040(17) and is regulated under Title 132Q of the Washington Administrative Code.

GNS 3 position were that he hold a valid Washington pesticide applicator's license and a regular driver's license. He held both.

In 2007, the district's fleet manager became aware that a number of employees assigned to drive large trucks requiring a commercial driver's license (CDL) for operation did not have the required license. Federal law requires that individuals obtain a state CDL, minimum standards for which are federally imposed, in order to drive a commercial weight vehicle in interstate or intrastate commerce. *See* 49 U.S.C. §§ 31301-31317. Commercial weight vehicles include single vehicles with a gross vehicle weight rating of 26,001 or more pounds. 49 U.S.C. § 31301(4)(A). District staff had earlier assumed, in error, that drivers were exempt from CDL licensing if they operated trucks only on campus. Among trucks in the district's fleet that required operator CDL licensing were four trucks used by the grounds crew. The Falls had one snow removal truck and one water truck that required a CDL-licensed driver. SCC had two snow removal trucks requiring a CDL-licensed driver. Neither campus had grounds crew workers with CDLs.

Once aware of the problem, management negotiated with the employees' union over requiring CDL licensing for some employment positions. Several positions were considered for mandatory CDL licensing. Ultimately management and the union agreed that CDL licensing should be required for grounds and nursery specialists, since snow and ice removal was their primary responsibility in the winter months. Employees in

other categories assisted with snow removal as needed, but had other winter work responsibilities. It was also agreed that CDL licenses should be required for equipment technicians, who needed to be able to operate commercial weight equipment in order to repair it.

After the decision on employee licensing was made, the position descriptions for GNS employees—which had always identified snow and ice removal and equipment operation as "essential duties" of the position—were modified to identify CDL licensing as a condition of employment. Current and newly hired grounds crew employees were initially given six months to obtain a CDL. The grace period was eventually eliminated in May 2009; grounds crew employees must now hold a CDL when hired.

Several employees, including Mr. Fey, proved unable to pass the physical examination for the CDL for medical reasons. In Mr. Fey's case, it was because he has a genetic eye condition that causes scarring of his retinas; the result is vision that can be corrected, at best, to 20/400 for his right eye and 20/50 for his left.[2] The district agreed with the union in 2007 to "grandfather" existing grounds crew employees with medically-disabling conditions into their positions. For winter snow removal, Mr. Fey was assigned

---

[2] The first number in the familiar "Snellen score" for visual acuity refers to the distance between the viewer and the visual target, typically 20 feet. The second number corresponds to the distance at which a person with normal eyesight could distinguish letters of the size that the viewer can distinguish at 20 feet. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 559 n.2, 119 S. Ct. 2162, 144 L. Ed. 2d 518 (1999).

a truck called a V-box sander, which had a 10-foot-wide snowplow blade and a bed to hold sand. With a gross weight of approximately 23,000 pounds, the V-box sander is a large snow removal truck but one that does not require a CDL for operation.

The combination of the CDL requirement for new hires and employee attrition had the intended effect of gradually increasing the number of CDL-licensed grounds crew employees. Whereas in 2007 no one on the grounds crew held a CDL, by 2011 half of the district's grounds crew had become CDL-licensed.[3] To the extent that the district still

---

[3] The following tables reflect the evidence presented at trial as to how CDL licensing of GNS employees increased.

At SCC:

| Position | GNS 4 | GNS 3 | GNS 2 |
|---|---|---|---|
| 2007 (pre-CDL requirement) | Paul Wittkopf—no CDL | Alfonso Hernandez—no CDL | Cary Abbott—no CDL |
| 2007 (post-CDL requirement) | Wittkopf—directed to obtain CDL, but promoted to maintenance mechanic before obtaining CDL | Hernandez—directed to obtain CDL | Abbott—directed to obtain CDL |

5

employed non-CDL licensed employees in the grounds crew it was the result of its

agreement to grandfather staff employed in 2007 who were medically unable to be

licensed. While transitioning to a fully CDL-licensed grounds crew, the district has

relied on a CDL-licensed maintenance mechanic and on two of its CDL-licensed

| 2008-2011 | Cary Abbott promoted to GNS 4, subject to direction to obtain CDL; when he was unable to obtain it, he was demoted back to GNS 2 and replaced by Shawn Clifford, who holds a CDL | Hernandez—acquired CDL in 2008; retired in 2011 and was replaced by Kevin Hall, who holds a CDL | Shawn Clifford hired—required to obtain CDL and did; he was promoted to GNS 4 when Cary Abbott, unable to obtain a CDL, was demoted back to this position, grandfathered without a CDL |

At The Falls:

| Position | GNS 4 | GNS 3 | GNS 2 |
|---|---|---|---|
| 2007 (pre-CDL requirement) | Fred Hale—no CDL | Mark Fey—no CDL | Greg Schauble—no CDL |
| 2007 (post-CDL requirement) | Hale—directed to obtain CDL | Fey—directed to obtain CDL | Schauble—directed to obtain CDL |
| 2008-2011 | Hale; unable to pass CDL physical; grandfathered with no CDL | Fey; unable to pass CDL physical; grandfathered with no CDL | Schauble obtains CDL but is promoted to equipment technician in August 2008; replaced by Jill Nishimura, who holds CDL |

equipment technicians to operate several of its largest trucks, drawing those employees away from needs in their own departments.

The disability discrimination alleged by Mr. Fey began in November 2007, when the promotion of Paul Wittkopf, the grounds lead at SCC, created an opening for the GNS 4 position at the SCC campus. By then, the job descriptions for all of the grounds crew positions had been revised to include the CDL requirement. Despite Mr. Fey's inability to become CDL licensed, he applied for the SCC grounds lead position. In making application, he did not claim a disability or request accommodation.

Because management knew that Mr. Fey was unable to get a CDL, he was not interviewed for the grounds lead position. The successful applicant was another district employee, Cary Abbott, a GNS 2 assigned to SCC. Like Mr. Fey, Mr. Abbott had not obtained his CDL. Unlike Mr. Fey, there was no reason to believe that Mr. Abbott would be unable to obtain the license within the six months provided by the job description. Mr. Abbott also had leadership skills. The first essential duty identified on the district's job description for the grounds lead position is to "[l]ead e.g. direct, assign, instruct, and evaluate other grounds personnel to facilitate grounds/irrigation work and complete preventive grounds maintenance programs." Ex. P-12.

Mr. Fey eventually learned that he had never been considered for the grounds lead position at SCC. He disagreed with the district's policy requiring grounds crew to hold CDLs. As he saw it, the district had always owned and used some snow clearing

7

equipment that did not require CDL licensing such as the V-box sander to which he was assigned. It had also relied on nongrounds employees to operate its largest snow removal equipment if they were experienced with the machinery. He viewed the V-box sander as adequate, if not superior, to the district's commercial weight, manual transmission-operated vehicles.

In September 2009, Mr. Fey presented a claim for damages to the State's Office of Risk Management alleging disability discrimination. In December 2009, he filed the action below, claiming employment discrimination and failure to accommodate a disability.

In the meantime, and due to other work demands at SCC, Mr. Abbott needed and was granted several extensions of time within which to obtain his CDL. When he failed to obtain it by a final January 2009 deadline he was demoted to his former GNS 2 position. Several months after Mr. Fey commenced suit, the district considered applicants for the GNS 4 position at SCC opened up by Mr. Abbott's demotion. Mr. Fey again applied. This time, he asked that the district waive the CDL requirement as an accommodation to his genetic eye disorder. The district again informed him that he would not be placed on the eligibility list because he did not have the CDL required for the position. The union declined to file a grievance over the district's refusal to consider his application.

TRIAL

Before trial, Mr. Fey voluntarily dismissed his claim of disparate treatment discrimination. He dropped it in an effort to prevent the district from arguing or presenting evidence suggesting that he had performed poorly as an employee. Br. of Resp't at 19. The trial court had expressed the view that evidence of his performance would be admissible to defend against his disparate treatment claim. He proceeded to trial solely on a theory that the district failed to accommodate his genetic eye disorder.

In support of his claim, Mr. Fey presented evidence that snow clearing equipment was generally used less than a dozen days a year; that the V-box sander to which he was assigned was a large and effective snow clearing machine and could have been transferred from The Falls to SCC, where, if he were the grounds lead, he could select it as his assigned vehicle; that the district now had more CDL-licensed employees than it had ever had; and that the district had historically been able to clear snow from campus roads and parking lots by using CDL-licensed equipment technicians and mechanics to drive commercial weight snow clearing equipment, by using CDL-licensed subcontractors, or both.

The district countered with evidence that while snow removal was ordinarily required only a couple of weeks during the school year, it was nonetheless a critical grounds crew function. Classes could not be conducted unless the roads and lots were cleared and the snow removal needed to be done as quickly and efficiently as possible. It

presented evidence that it adopted its neutral CDL-licensing requirement for grounds crew only after evaluating the most effective use of its employees and obtaining the agreement of the union; that it had applied the policy consistently to all applicants for grounds positions since the fall of 2007; that while it now had more CDL-licensed grounds crew than in 2007, it was only by virtue of adopting and enforcing CDL-licensing as a condition of employment; and that it had valid business reasons for moving toward universal CDL licensing for its grounds crew, including coverage if a CDL-licensed employee was out and so that it could stop relying for support on equipment technicians and maintenance mechanics, who were being pulled away from other responsibilities.

At the close of the evidence, the district moved for a directed verdict. It argued, first, that CDL licensing was a bona fide occupational requirement and second, that Mr. Fey failed to meet his burden of demonstrating that there was a reasonable accommodation that would have enabled him to perform an essential job function: being able to drive commercial weight equipment and lead (direct, instruct, and evaluate) other grounds crew employees driving such equipment. The trial court denied the motion.

The jury found by special verdict that Mr. Fey had a disability, the district was aware of it, and the district failed to reasonably accommodate it. While Mr. Fey had asked the jury to award him $7,500 in back pay, $80,888 in front pay and benefits, and

$50,000 in damages for emotional distress, the jury awarded only $7,549 in damages for lost wages and nothing for emotional distress.

Mr. Fey moved for additur. The trial court granted the motion, awarding Mr. Fey the $50,000 in emotional distress damages that he had requested. The court also awarded Mr. Fey $71,193 in attorney fees and $9,150 in costs.

The district timely appealed.

## ANALYSIS

### I. Introduction

Under federal and state law, employees complaining of discrimination may assert several different claims: disparate treatment; disparate impact; or, in the case of disabled workers, failure to accommodate a disability. Each theory of liability contemplates some balance between employees' right to be free from discrimination and legitimate operational needs and interests of employers. The proof of a potentially overriding employer interest varies in the case of each claim. Because the parties' briefing relies on state and federal cases from several contexts, we first address the distinct nature of Mr. Fey's claim and the issue on which we conclude the outcome depends.

The law is most wary of an employer's facial discrimination against a protected class. In disparate treatment cases alleging facial discrimination, the employer's defense—that the facially-discriminatory qualification it applies is a "bona fide occupational qualification" (BFOQ)—has been narrowly construed.

Federal law limits the BFOQ defense to disparate treatment cases where an employer applies a classification based on age, religion, sex, or national origin that "serve[s] as a necessary proxy for neutral employment qualifications essential to the employer's business." *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 411, 105 S. Ct. 2743, 86 L. Ed. 2d 321 (1985). To legitimately rely on a facially discriminatory qualification, the employer must either have a factual basis for believing that all or substantially all persons who lack the qualification would be unable to safely and efficiently perform the duties of the job, or be able to prove that some excluded employees would be unable to perform safely and efficiently and it is impossible or highly impractical for the employer to distinguish the employees who do or do not present the risk. *Id.* at 414 (adopting a two-part test set forth in *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir. 1976)). Washington courts have adopted this narrow construction of the BFOQ defense to a claim of disparate treatment under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 358, 172 P.3d 688 (2007) (citing *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 646 P.2d 113 (1982)); *but cf.* Andrea J. Menaker, Note & Comment, *Burdening the Plaintiff: Proving Employment Discrimination after* Kastanis v. Educational Employees Credit Union, 70 WASH. L. REV. 253, 267 (1995) (noting that the Human Rights Commission's colloquial use of "business necessity" in defining "bona fide occupational qualification" in regulations may contribute to confusion).

12

Examples will illustrate the narrowness of BFOQs: If a wet nurse were needed, being female would be a BFOQ. *See Rosenfeld v. S. Pac. Co.*, 444 F.2d 1219 (9th Cir. 1971). If the protagonist in a motion picture was of a particular age and ethnicity, that age and ethnicity would be BFOQs. *See* WAC 162-16-240(1). If incapacitating medical events and adverse psychological and physical changes make it unsafe to employ some persons as airline pilots over age 60 and it is impossible or highly impractical to determine which persons present a risk, the Federal Aviation Administration (FAA) could refuse to license pilots beyond age 60. *See Criswell*, 472 U.S. at 404 (recognizing such an FAA policy). Only that type of strong correlation supports a facially discriminatory BFOQ. Otherwise, the law requires that an employer couch job qualifications in neutral terms.

Where qualifications are couched in neutral terms but nonetheless have a disparate impact on a protected class, it is the business necessity defense, not the BFOQ defense, that federal law recognizes as applying. *See Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199-200, 111 S. Ct. 1196, 113 L. Ed. 2d 158 (1991) (BFOQ defense does not apply to any but disparate treatment cases). Under Title VII's[4] disparate-impact statute, an employer may defend by demonstrating that its challenged employment practice "is 'job related for the position in

---

[4] Civil Rights Act of 1964, 42 U.S.C. § 2000e.

13

question and consistent with business necessity.'" *Ricci v. DeStefano*, 557 U.S. 557, 578, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). Where a plaintiff's claim is asserted under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213, § 12113(a) provides a defense to a claim of disability discrimination where a standard that screens out or otherwise denies a job to an individual with a disability "has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation." Washington cases have likewise recognized "business necessity" as an affirmative defense for an employer responding to a disparate impact claim. *See Shannon v. Pay 'N Save Corp.*, 104 Wn.2d 722, 730, 709 P.2d 799 (1985) (adopting Ninth Circuit's standard for proving business necessity articulated in *Contreras v. City of Los Angeles*, 656 F.2d 1267 (9th Cir. 1981)).

Here, Mr. Fey did not claim that the district engaged in intentional discrimination. He did not claim that it applied a qualification with a disparate impact on a protected class that could not be justified by business necessity. He claimed only that he had a disability, known to the district, that it failed to accommodate.

Under federal law, a reasonable accommodation claim under the ADA does not implicate either a BFOQ defense or a defense of business necessity. Rather, the ADA requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an

14

applicant or employee, unless . . . the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).

"Undue hardship" is an employer's last defense; one that it may assert where an otherwise qualified employee could ordinarily be reasonably accommodated but cannot in a particular case, based on typically case-specific circumstances. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 402, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002). The primary protection of the employer's operational and business interest in reasonable accommodation cases, though, is the fact that the employee bears the burden of proving that he or she is *otherwise qualified* for the position held or desired, with an accommodation that is *reasonable* in the run of cases. *See id.*

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). It further provides in determining whether an individual is qualified for purposes of the ADA's provisions dealing with employment (Subchapter I),

> consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

*Id.*

15

Federal regulations provide a nonexclusive list of evidence relevant to whether a function is essential. The first is evidence of "[t]he employer's judgment as to which functions are essential." 29 C.F.R. § 1630.2(n)(3)(i). The second is "written job descriptions prepared before advertising or interviewing applicants for the job." 29 C.F.R. § 1630.2(n)(3)(ii). Other examples of relevant evidence included in the list are

(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

For purposes of the ADA, the employer's identification or judgment as to the essential functions of a position is entitled to deference. *See, e.g., Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) ("we do not second-guess the employer's judgment as to the essential functions"); *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004) (a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) (quoting Equal Employment Opportunity Commission Technical Assistance Manual at II-18 (1992) as providing that "'[i]t is the employer's province to establish what a job is and what functions are required to perform it'"); *Equal Emp't Opportunity Comm'n v. Amego, Inc.*,

16

110 F.3d 135, 145 (1st Cir. 1997) (where plaintiff presents no evidence of discriminatory intent, "there should be special sensitivity to the danger of the court becoming a super-employment committee"); *Riel v. Elec. Data Sys., Corp.*, 99 F.3d 678, 682 (5th Cir. 1996) (employer's description of the essential functions is entitled to substantial deference). The fact finder's role includes determining whether functions that the employer claims are essential are ones that the employer *in fact* treats as essential. If the employer's identification of its allocation of functions is borne out by its conduct, the fact finder's role does not extend to substituting its own judgment for how the employer should allocate essential work among employment positions in the workplace.

Washington law is well settled that to prove a claim for failure to accommodate, a plaintiff must demonstrate that he or she can perform the essential functions of the job as determined and applied by the employer—not that the employer could revamp the essential functions of a job to fit the employee. Thus, in *Clarke v. Shoreline School District No. 412*, 106 Wn.2d 102, 119 n.4, 720 P.2d 793 (1986), the Supreme Court agreed with the Court of Appeals that the relative qualifications of individuals to serve in teaching positions was properly the province of professional educators, not the courts. In *Snyder v. Medical Service Corp. of Eastern Washington*, this court observed that the intent of the ADA (which it found persuasive in applying the WLAD) was to avoid interfering with personnel decisions by, for example, establishing employment conditions for a position. 98 Wn. App. 315, 328, 988 P.2d 1023 (1999) (citing *Gaul v. Lucent*

*Techs. Inc.*, 134 F.3d 576 (3d Cir. 1998)), *aff'd*, 145 Wn.2d 233, 35 P.3d 1158 (2001). In *Pulcino v. Federal Express Corp.*, 141 Wn.2d 629, 644, 9 P.3d 787 (2000), our Supreme Court held that an employer's duty to reasonably accommodate a disabled worker does not require the employer "to alter the fundamental nature of the job, or to eliminate or reassign essential job functions." In *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 536, 70 P.3d 126 (2003), the court affirmed the trial court's conclusion that Microsoft was entitled to judgment as a matter of law dismissing the plaintiff's claim, observing that

> [i]n effect, what Davis asks this court to do is redefine for Microsoft its systems engineer position; but just as the WLAD does not authorize Davis or this court to tell Microsoft how to set its selling objectives and customer service goals, the WLAD does not permit Davis or this court to tell Microsoft how to organize its work force and structure individual jobs to reach those targets.

Washington decisions have relied on the federal regulations as illustrative criteria to determine whether a particular function is essential. *Dedman v. Pers. Appeals Bd.*, 98 Wn. App. 471, 479, 989 P.2d 1214 (1999) (citing 29 C.F.R. § 1630.2(n)(3)); *Davis v. Microsoft Corp.*, 109 Wn. App. 884, 891, 37 P.3d 333 (2002), *aff'd*, 149 Wn.2d 521.

The central point of contention in the trial below was whether being able to drive the commercial weight vehicles in the district's fleet (and direct, instruct, or evaluate subordinate grounds crew workers charged with driving them) was an essential function of the grounds lead position sought by Mr. Fey. If being able to drive commercial weight vehicles in the district's fleet was an essential function, then Mr. Fey's claim fails.

18

Reasonable accommodation was not at issue, because Mr. Fey and his medical expert both agreed he could not become CDL-licensed. The same is true of what Mr. Fey characterizes as his separate claim for the district's failure to engage in the interactive process. A failure to engage in an interactive process does not form the basis of a disability discrimination claim in the absence of evidence that accommodation was possible. *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 100-01 (2d Cir. 2009) (surveying the federal circuit courts' uniform agreement on this score).

## II. The District's Assignments of Error

The district alleges dozens of errors by the trial court. Most of its assignments and issues do not present errors or abuse of discretion. A few do,[5] and would cause us to

---

[5] Evidence of the district's plans for increasing the number of commercial weight vehicles in its fleet was relevant to its judgment that the ability to operate CDL equipment was an essential function of GNS positions. The evidence should not have been excluded. For this purpose, evidence of management's actual, existing intention as to future equipment acquisitions is not speculative just because, for budgetary or other reasons, the intention might never come to fruition. Equipment acquisition expectations can still, and often will, factor into work assignments and hiring decisions.

Evidence of Mr. Fey's work history and reputation that made it unlikely he would have received the GNS 4 promotion was relevant. While proving that he would have been hired was not an essential element of Mr. Fey's reasonable accommodation claim, the district's evidence clearly bore on his damage claim. *See Muntin v. State of Cal. Parks & Recreation Dep't*, 671 F.2d 360, 362 (9th Cir. 1982) (holding "the law does not contemplate an award of backpay to a plaintiff who, though qualified, would not have been hired or promoted even in the absence of the proven discrimination"); *Davis v. Dep't of Labor & Indus.*, 94 Wn.2d 119, 127, 615 P.2d 1279 (1980) (employer may demonstrate that backpay is not recoverable by proof that employee would not have been hired). The evidence should not have been excluded.

Finally, evidence of what the district contended to be the essential functions of the

reverse and remand for a new trial were we not persuaded of one error that renders the others moot: the trial court should have granted the district's motion for judgment as a matter of law.

At the conclusion of the evidence, the district moved for a directed verdict—now termed a judgment as a matter of law. CR 50. One basis urged for the motion was that Mr. Fey was required to prove there was a reasonable accommodation that would have enabled him to perform the essential job duties, something he did not prove, given that the essential job duties of the grounds lead position included driving CDL equipment. The only evidence offered by Mr. Fey to challenge the district's position that being able to drive commercial weight equipment was an essential function of the grounds lead position were (1) testimony second-guessing the district management's preference for commercial weight equipment and (2) evidence that the district had previously made an

---

grounds lead position was relevant. *See, e.g., Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (adopting the Eighth Circuit's view that the employer bears the burden of production to come forward with evidence establishing its view of the essential functions of a position, even though the employee bears the ultimate burden of proof). Both parties objected to questions about essential functions of the grounds lead position as calling for legal conclusions (*see, e.g.*, Report of Proceedings at 466, 472, 532, 688-89), so little evidence addressed the essential functions in direct terms. The objections were not well taken. Whether a function is an essential function of a position is ordinarily a question of fact. *See Bates*, 511 F.3d at 991-92 & n.7. Testimony of management and others as to their view of which functions are essential is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. ER 704.

exception for the several employees grandfathered into their existing positions in 2007 pursuant to agreement with the union.

A motion for judgment as a matter of law must be granted when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. *Davis*, 149 Wn.2d at 531. We review a trial court's denial of a motion for judgment as a matter of law de novo, applying the same standard as the trial court. *Id.* at 530-31.

"Substantial evidence" has been described as evidence "sufficient . . . to persuade a fair-minded, rational person of the truth of a declared premise." *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 147, 381 P.2d 605 (1963). Here, viewing the evidence in the light most favorable to Mr. Fey, there was no substantial evidence that the district did not genuinely treat the ability to drive its commercial weight trucks as an essential function of the grounds lead position at SCC.

The district met its burden of producing evidence that it viewed being licensed and able to drive commercial weight vehicles as an essential function of the grounds lead position in and after 2007. Even before 2007, its job descriptions for GNS positions identified ability to operate grounds keeping equipment as an essential duty of the job even if it was unaware, at the time, that some of its trucks required CDL licensing.

21

As modified in 2007, the job description for the grounds lead position for which

Mr. Fey applied stated all of the following:

> Its "general definition" of the position described it as requiring the employee to
> "perform a variety of skilled tasks" and "operate necessary grounds equipment to
> perform required functions."
>
> Its itemization of characteristic duties and responsibilities included, as essential
> duties, "[l]ead e.g. direct, assign, instruct, and evaluate other grounds personnel";
> "[o]perate power and motorized equipment" followed by examples of equipment
> used by grounds employees; and "[r]emove . . . snow and ice from grounds, roads,
> parking facilities and lots, sidewalks, ramps, and stairs."
>
> Its identification of required competencies included "[t]he ability to perform
> assigned duties in a manner consistent with applicable laws."
>
> Finally, its conditions of employment included "[p]ossess a CDL License with a
> tank endorsement" within the first six months of hire.

Ex. P-13. Any applicant applying for the SCC grounds lead position could presumably

have determined that two of the trucks used for grounds operations on the SCC campus

were commercial weight trucks requiring CDL-licensing. Mr. Fey did not have to

inquire; he knew. Certainly the implication of the CDL license requirement to a

reasonable reader of the job description was that commercial weight equipment must be

included within the equipment used by the grounds crew and as to which the grounds

lead would be directing, instructing, and evaluating subordinates. If there was doubt in

Mr. Fey's mind when he first applied for the grounds lead position whether the district

viewed the ability to operate CDL equipment as an essential function of the job, he soon

learned that it did; he was told as much when he inquired why he had not been interviewed for the 2007 opening.

Mr. Fey was entitled to challenge the district's claim that it regarded driving CDL equipment as an essential function with any evidence undercutting the good faith of that assertion. But his evidence of the district's agreement with the union to grandfather three employees did not undercut the district's position.

Evidence that an employer has reluctantly and narrowly waived performance of a function may not undercut an employer's position that the function is essential— depending on the circumstances, it may support the employer's position. In *Davis*, for instance, our Supreme Court did not regard the fact that Microsoft temporarily accommodated Mr. Davis's request to reduce his assigned work by half without adverse consequences as evidence that carrying a greater-than-40-hour-a-week workload was not essential. The accommodation was temporary. Microsoft made clear it was temporary, articulating sound business reasons why it was unwilling to make any permanent change to Mr. Davis's duties as a systems engineer. The particular circumstances of Microsoft's accommodation of Mr. Davis were more probative of Microsoft's good faith position that the ability to work overtime was essential than they were of Mr. Davis's position that it was not.

Similarly, in *Samper v. Providence St. Vincent Medical Center*, 675 F.3d 1233, 1240 (9th Cir. 2012) the Ninth Circuit rejected the plaintiff's argument that her hospital-

23

employer could accommodate incremental waivers of responsibilities of a single employee—what the court referred to as a plaintiff's "'drop in the bucket' approach." There, the defendant hospital had suffered the plaintiff's failure to comply with its attendance policy in the past, at the same time disapproving her failure to comply and making clear that her performance must be corrected. The plaintiff pointed to the hospital's tolerance for her failure to comply—the fact that it did not have a zero tolerance policy—as evidence that it could accommodate her future noncompliance. But the court concluded that her arguments "do nothing to undermine Providence's principal claim," which was that its attendance policy did reflect an essential function and that further exceptions from the policy had serious repercussions for its operations. *Id.*

The same can be said of Mr. Fey's evidence that the district grandfathered him and two other employees in 2007 and thereafter worked around those employees' limitations in the grandfathered positions. David Cosby, a shop steward who participated in the union's 2007 negotiations with management over which employees should be required to get CDLs, testified that the individuals involved in the negotiations agreed unanimously that grounds positions assigned responsibility for snow removal or required to drive commercial weight equipment "were the natural fits to get the CDL." Report of Proceedings (RP) at 575. The evidence was undisputed that the district has waived the CDL requirement only for those workers it agreed to grandfather in 2007. And it has done so consistently: after all, the GNS 4 opening in 2010 that Mr. Fey claims he should

have been hired to fill was one that Cary Abbott (an employee in 2007 entitled to be grandfathered into a GNS 2 position) lost, because the district, consistently applying its policy, demoted Mr. Abbott as unqualified when he did not obtain a CDL.

The district presented evidence why it was unwilling to fill any grounds crew opening with a non-CDL licensed employee. Jeff Teal, the campus facilities manager at SCC, testified that when equipment technicians and maintenance mechanics are pulled away from their duties to do snow removal because the work cannot be done by grounds crew, there is no one to fill in and do the equipment repair and maintenance tasks. Conversely, when there is snow, the grounds crew has no duties other than to remove it. Mr. Teal described problems that arose in 2008 when SCC was required to rely on equipment technicians to drive its large snow removal equipment:

> Q. . . . [W]hen [equipment technicians Greg Schauble and Bryan Perkins] were called in, was there anyone that was available to fill in for them?
> A. No.
> Q. Was that causing problems?
> A. Absolutely.
> Q. Can you describe the problems that caused when you don't have the staff to do the job they're intended to do?
> A. Especially looking back at that snow year, that's when we had everything go wrong. All of our equipment was breaking down because of the amount of snow we were receiving. The problem was, is we had them out there plowing, but none of our other equipment was being repaired, that we had other volunteer[s], like custodians to do snow removal with smaller equipment. They couldn't do it because it was broke down. So it hindered the whole operations.

25

RP at 793-94.

Mr. Fey's only other evidence challenging the district's position that the ability to drive commercial weight equipment was an essential function of the grounds lead position was his testimony and that of several other employees as to the relative merits of the district's commercial weight and lighter weight vehicles. He presented evidence that he and some other employees preferred the lighter weight vehicles with automatic transmissions. He and some of his witnesses questioned whether the district needed commercial weight equipment. The jury's function does not extend to second-guessing district management's judgment about the makeup of its fleet. The evidence was immaterial.

Where there is no material dispute as to the evidence, the court may determine as a matter of law that a function claimed to be essential by the employer is in fact essential. That was the situation here. Mr. Fey's evidence showed only that he could have performed all of the functions of the grounds lead job if its essential functions were changed. He did not prove that he could perform the essential functions as defined and applied in practice by the district.

In light of our disposition of the appeal, we need not address Mr. Fey's cross appeal. We deny Mr. Fey's request for attorney fees and costs on appeal as authorized by the WLAD because he is not the prevailing party.

No. 29912-1-III
*Fey v. Cmty. Colleges of Spokane*

We reverse the trial court's denial of the district's CR 50 motion for judgment as a matter of law and remand for dismissal of Mr. Fey's claim.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Kulik, J.