**FILED**
**SEPTEMBER 10, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SHANNON KRIES AND PETER KRIES, | ) | |
| | ) | No. 32879-1-III |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WA-SPOK PRIMARY CARE, LLC, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

FEARING, J. — This appeal discusses whether a health clinic must employ or provide a reasonable accommodation to a wounded employee, when the clinic asserts concerns about the wound spreading infection to patients. The trial court granted defendant WA-SPOK Primary Care, LLC, dba Women's Clinic at Deaconess Hospital summary judgment and dismissed plaintiff Shannon Kries' disability discrimination suit. Because of disputed material facts, we reverse.

## FACTS

Shannon Kries bore a surgical wound with inserted drains that led her employer, the Women's Clinic, to discharge her from employment. This statement of facts describes Kries' wound, explains the healing process of wounds, analyzes the risks of wounds, provides the treatment history for Kries' wound, recounts employment policies at the Women's Clinic, and relates the clinic's responses to Kries' attempts to return to work. Because the trial court dismissed Shannon Kries' claim for disability

discrimination on summary judgment, we present the facts in a light most favorable to Kries.

Shannon Kries is a trained medical assistant. In 2007, while employed at Community Health Association of Spokane (CHAS), Kries underwent a panniculectomy, the removal of excess skin around the abdomen after weight loss. The surgery left an open wound. Defense expert, Dr. Michael Gillum, concedes that Shannon Kries' wound was a physiological condition identified in medical records, prerequisites for consideration as a disability under state law. CHAS allowed Kries to return to work after her surgery as long as she packed and covered the wound as her doctor instructed. Kries continued to work at CHAS through the end of 2009.

On December 31, 2009, the Women's Clinic at Deaconess Hospital hired Shannon Kries as its lead medical assistant. In this position, Kries served as the clinic's receptionist and assisted in taking patients' health history, vital signs, and blood.

Upon Shannon Kries' hire, the Women's Clinic instructed Kries to complete a preplacement assessment questionnaire, which sought the employee's medical history. Kries completed and signed the form, but did not date it. The completed form did not list Kries' stomach surgery. Kries did not remember returning the completed form to the Women's Clinic. Kries testified that she told clinic personnel about her wound. Nevertheless, she did not recall informing her immediate supervisor about the wound when she was hired.

2

Shannon Kries' abdominal wound slowly healed at the time she commenced employment with the Women's Clinic in January 2010. Kries cleaned the wound at home in the morning and evening, packed the lesion with gauze, bandaged it, and covered it with clothes. Kries never packed or dressed the wound while at work, and the wound never weeped or leaked at the Women's Clinic. The Women's Clinic presented no evidence that Kries passed an infection to a patient or employee.

On June 8, 2010, Shannon Kries sought treatment from Dr. Stephen Olson because her abdominal wound stopped healing. Kries' original wound had decreased from thirty two centimeters to fifteen centimeters in size, but remained at the smaller size for months. Olson recommended surgery to stimulate healing. Kries spoke with her Women's Clinic supervisor, Carolyn Barnes, and informed her that she needed leave for the surgery. The clinic allowed Kries leave, even though her short tenure did not qualify her for leave under the Family Medical Leave Act (FMLA).

On July 14, 2010, Stephen Olson operated on Shannon Kries. Olson inserted two drains through separate quarter inch skin incisions in the abdomen, and the drains exited through two separate holes in the skin. Dr. Olson inserted the drains adjacent to the wound. He sutured and stapled shut the wound.

On July 27, 2010, Stephen Olson granted Shannon Kries an unrestricted release to return to her Women's Clinic job with both medical drains in place. Olson considered Kries' wound as closed, not open. In Olson's opinion, Kries did not pose a risk to herself

3

or others since work clothes covered the drains and the closed wound. The signed work release stated that Kries carried no infection.

Mary Wise, a registered nurse and the Women's Clinic's employee health coordinator, refused to permit Shannon Kries reemployment until Kries' abdominal wound fully healed. Wise based her decision on the clinic's infection control policy. The opening sentence to the nine-page policy read:

> No one is allowed to work with an open or draining wound.

Clerk's Papers (CP) at 248. Neither the infection control policy nor the return to work policy defined "open or draining wound." According to Dr. Michael Gillum, Deaconess Hospital chair of the Infection Control Committee, the policy applies "across the board," regardless of whether the employee holds a patient care position or non-patient care position. CP at 367.

The Women's Clinic also maintained a "Policy for Return to Work with Restrictions following Non-Work Related Injury, Surgery, or Personal Medical Conditions" (return to work policy). CP at 445. The return to work policy differentiated between direct patient care and non-patient care work employees. The policy read, in relevant part:

> **Part 1: All employees involved in direct *patient care* regardless of job code . . .**
> **A. Restrictions that will <u>NOT</u> be allowed in *patient care* are as follows:**
> . . . .

4

> No sutures or open wounds on hands or forearms.
>
> . . . .
>
> **B. Restrictions that may be allowed in *patient care* areas with the approval of Employee Health and the department manager are as follows:**
> Sutures or wounds that can be completely covered, other than hands/forearms (i.e. chest, leg, face).
> **Part 2: All employees in non-*patient care* areas (Administrative, Medical records, PFS, etc.)**
>
> . . . .
>
> **B. Restrictions that may be allowed in *non-patient care* areas with the approval of Employee Health and the department manager are as follows:**
> Sutures or wounds that can be completely covered.

CP at 445. The return to work policy was silent on whether or not an employee with an inserted drain could return to work.

According to Sharyl Bergerud, director of infection control at Deaconess Hospital, the Women's Clinic conducts an evaluation of an employee on a "case-by-case" basis to assess the status of a wound and, in turn, whether the employee may return to work. CP at 335. Importantly, no one examined Shannon Kries' wound or drains to determine if restrictions would be appropriate and capable of allowing Kries to return to work in either a patient care or non-patient care position.

Shannon Kries' immediate supervisor, Carolyn Barnes, spoke with clinic Human Resources Department and Employee Health Care Coordinator Mary Wise about returning Kries to work. Barnes learned that Kries could not return in any capacity so long as Kries had a draining wound because the infection control policy governed.

Barnes could have provided Kries non-patient care work if the Women's Clinic allowed Kries to return to employment. Kries wanted to return to work in any capacity and would accept a reduction in pay. She made weekly calls to Wise and Carolyn Barnes to update them on her progress and inquire about other positions.

The various medical professionals testifying in this case, including the parties' experts, offered diverse definitions of "open wound" and "draining wound." Dr. Stephen Olson, Shannon Kries' attending general surgeon, defined an "open wound" as one that had a break in the skin when the dermis and epidermis are not intact. CP at 337. He defined a "draining wound" as one where drainage came out of the wound. CP at 337. He opined that one could have a draining wound without it being an open wound. Olson did not consider Kries' wound to be an open wound. After surgery, he closed the wound with staples. The wound remained closed despite the drains, because each drain exited through the skin and not through the wound.

Dr. Francis Riedo, the medical director of infection control and medical director of employee health at Evergreen Hospital in Kirkland, Washington, testified as an expert witness for Shannon Kries. Dr. Riedo noted redundancy in the infection control policy provision that referenced "open and draining wounds." According to Riedo, an open wound is always draining. CP at 360. Since the policy does not preclude working with a closed wound, Riedo read the policy to allow work with a closed wound that is draining. Therefore, Riedo considered a "draining wound," under the infection control policy, as

one that could not be contained and controlled. A covered wound, with its drainage controlled, was not an open or "draining wound."

According to Dr. Francis Riedo, an employer needs an unambiguous policy and the Women's Clinic's infection control policy is ambiguous. Riedo noted that employees leak secretions constantly from their genitals, mouths, and noses. Therefore, for the Women's Clinic policy to make sense, a draining wound should be an uncontrolled draining.

Defense witness Dr. Michael Gillum, chair of the Deaconess Hospital Infection Control Committee, did not know why the infection control policy did not define the terms "open wound" or "draining wound." He did not believe "any wound that is open" to be a helpful definition. CP at 371. To Gillum, the term "open wound" is self-explanatory and meant any wound not healed. CP at 371. According to Gillum, a scabbed wound is an "open wound." CP at 371. Gillum opined that any open wound was a "draining wound" and so he considered the two synonymous. CP at 371. He also deemed a sutured wound to be a closed wound. One with a sutured wound may return to work, according to Gillum. Dr. Gillum did not know if the Women's Clinic allowed an employee with a colostomy, ileostomy, peripherally inserted central catheter (PICC line), or insulin pump to work.

Sharyl Bergerud, director of infection control at Deaconess Hospital, testified about language in the Women's Clinic's return to work policy that allowed an employee

7

not involved in patient care to return to work so long as the worker had "[s]utures or wounds that can be completely covered." CP at 299. Bergerud interpreted the provision to be a per se exclusion on any "open wound." CP at 334. Bergerud could not identify any other writing that supported her interpretation of the conflicting Women's Clinic policies. She also attested that the clinic would need to review an employee with a permanent apparatus, such as a colostomy bag, on a "case-by-case basis" to determine whether the clinic could grant a workplace accommodation. CP at 334.

Women's Clinic Employee Health Coordinator Mary Wise's duties included assessing an employee's fitness to return to work. Wise believed any unhealed wound to be an "open wound." CP at 405. A wound needed complete healing or a scab for a wounded employee to return to work.

The physician witnesses, in addition to disagreeing on a definition of "open or draining wound," sparred on whether Shannon Kries posed a risk to patients of the Women's Clinic. Dr. Stephen Olson, Kries' treating physician, felt that if Kries' clothing covered the wound and drains, she did not pose a risk to someone else. Kries would not infect any patients, as she had no active infection when she was first cleared for work. Olson opined that the drain would not limit her ability to perform her essential job functions.

Dr. Francis Riedo, an infection control physician, opined that Kries was not a risk to return to work as long as she covered the wound with an appropriate dressing and

8

clothing and the wound was uninfected. Under such conditions, Kries posed no greater risk of transmitting infection from her wound or drain tubes to another person than anyone else in the workplace. Dr. Riedo observed that, under the Women's Clinic return to work policy, open or sutured wounds on the hands and forearms are not allowed. Therefore, open wounds on other areas of the body are allowed if they can be covered completely. According to Riedo, Kries could and did cover her wound completely and so was eligible to return to work in her regular job as a medical assistant.

Dr. Francis Riedo testified that the Women's Clinic failed to follow its decision making process to resolve a difference in opinion with an employee about the interpretation of the infection control policy. He maintained that under the Women's Clinic policy, the Employee Health Office of the clinic should have consulted with the chair of the clinic's Infection Control Committee or the medical director for employee health. The clinic should have encouraged direct discussions between the two physicians to resolve questions of Shannon Kries' employment with the least restrictive means to enable Kries to continue work. Upon Kries' seeking a return to employment, the clinic failed to contact or consult with Dr. Gillum, chair of the Infection Control Committee, or the medical director of employee health.

Dr. Francis Riedo further observed that, other than on September 13, 2010, the Women's Clinic took no cultures from Shannon Kries to establish if she was infected. Without cultures evidencing an infection, the clinic should have deferred to the treating

9

surgeon's judgment and experience in releasing a patient to work. According to Riedo, a strict policy of no employment with an open or draining wound assumes incorrectly that every wound is infected and that no wound or body fluid can be effectively contained. This line of reasoning would by extension lead to a policy of preclusion from employment of anyone with a colostomy bag, periodontal disease, and even a woman during her menstrual cycle. Dr. Riedo testified that a potential risk of infection is not a sufficient reason to prevent someone from working.

Dr. Michael Gillum testified that he did not know whether the United States Center for Disease Control issued recommendations that a health care employee should not work with an open or draining wound. Gillum knew of no medical literature that suggested a person who has an open or draining wound should not return to work in any capacity. Although Gillum approved the Women's Clinic infection control policy at the time of its adoption, Gillum did not know the basis or genesis of the policy.

According to Dr. Gillum, Sharyl Bergerud would act reasonably if she contacted an infection specialist physician before excluding an employee with a wound from working. Bergerud would have also acted sensibly to consult with Dr. Stephen Olson, Shannon Kries' treating physician, before refusing Kries a return to work.

Dr. Michael Gillum opined that the return of Shannon Kries to labor at the Women's Clinic posed an unacceptable risk because of the possibility that, even with the wound packed in gauze and sealed in tape, the wound could leak. The risk of an open

wound is colonization of bacteria and transmittal of the infection to another. Nevertheless, Gillum conceded that Kries, as a medical assistant, would recognize any leaking. He worried about whether Kries could promptly rectify the leaking.

The Women's Clinic return to work policy allowed an employee with a sealed wound in the forearm to return to employment. Michael Gillum conceded that a sealed forearm wound posed a greater risk than Shannon Kries' abdominal wound. During his deposition, Dr. Gillum was asked if he would disagree with the Women's Clinic granting Shannon Kries a job with minimal patient contact. Gillum's only response was that the return to work would violate employment policy.

On August 19, 2010, Shannon Kries sought additional treatment from Dr. Stephen Olson after Kries accidentally detached the abdominal wound drains while exiting from bed. Olson performed a computed tomography (CT) scan and discovered an abscess resulting from bacteria inside the healed drain incision. On August 19, Olson drained the abscess' fluid and inserted a new drain in Kries' abdomen. On August 30, 2010, Kries contacted Olson's office and requested antibiotics for chills, nausea, and redness around the drain area.

On Friday, September 10, 2010, Dr. Stephen Olson again released Shannon Kries to return to work. Olson signed a note which stated: "Drain is out. May return to work." CP at 101. On September 10, Mary Wise completed Women's Clinic paperwork to return Kries to work, noting "drain is out ☺." CP at 258. Nevertheless, infection

returned to Kries' wound over the weekend, and Kries did not return to work as planned on Monday, September 13. On September 13, a fevered Kries entered the hospital, where health care providers administered intravenous antibiotics and inserted another drain to tap the infected fluid.

On September 15, 2010, Dr. Stephen Olson's nurse gave Shannon Kries a note stating "Pt had a Drainage Tube placed surgically in the Abdominal Wall on Monday, September 13, 2010. Per Dr. K. Stephen Olson." CP at 434. Olson instructed his nurse to write the note. During a deposition, Olson confirmed that the nurse wrote the September 13 note on a return to work form, but he admitted that the note did not include an express authorization to return to work. Kries viewed the note as a release to return to work and delivered it to Mary Wise. Due to replacement of the wound drain, Wise denied Kries' request to return to work. Wise informed Kries of the futility of bringing any further return to work forms while Kries suffered an open wound. Wise added that, even if a wound is covered, the Women's Clinic considers the wound "open." CP at 405. The rule is black and white to the clinic.

On October 5, 2010, Shannon Kries visited with Dr. Stephen Olson. By October 5, Kries' original abdominal wound had healed, but the drain remained. After speaking with Kries, Olson called the Women's Clinic and informed the clinic that Kries could return to work with the drain without posing harm to others. The clinic again refused Kries' request to return to work. The clinic's Infection Control Department responded to

Dr. Olson: "I'm sorry, that's our policy." CP at 346. According to Sharyl Bergerud, the infection control policy governs over a physician's permission to return.

On October 21, 2010, Shannon Kries returned to Dr. Stephen Olson because the drainage from the wound turned foul. A culture of Kries' wound drainage revealed two forms of bacteria, beta strep and Peptostreptococcus, which are sources of infection.

On October 22, Dr. Olson opened Kries' drain tract and found an abscess, which Olson packed with gauze in the hopes of final healing. After this procedure, Kries no longer carried a drain. Instead the wound drained into the gauze. By November 5, 2010, Kries still endured an open wound with more than usual draining. On November 14, Dr. Olson performed a CT scan and found another deeper abscess, which he drained.

On November 16, 2010, the clinic terminated Shannon Kries from employment. The termination letter stated:

> Deaconess Medical Center [Women's Clinic] has exhausted all options providing you time away from work.
> Because of your inability to perform the essential functions of your position, Deaconess Medical Center will be separating your employment effective November 16, 2010. You are eligible for rehire, should you wish to return to Deaconess Medical Center when you are able.
> Deaconess Medical Center is an equal opportunity employer and encourages you to submit your resume through our electronic applicant system for any position that you believe you are qualified for. Open positions are posted daily at www.deaconessmc.com.

CP at 435.

By November 23, 2010, Shannon Kries' abdominal wound had undergone

substantial healing. Dr. Michael Gillum, the Women's Clinic's expert, testified that

Kries' wound healed by the end of November 2010 and she could have returned to work

then.

In both December 2010 and January 2011, the Women's Clinic sought the hire of

a medical records clerk. The medical records clerk was not involved in direct patient

care. In January 2011, the clinic also sought to employ a receptionist.

## PROCEDURE

Shannon Kries sued the Women's Clinic for disability discrimination and failure

to reasonably accommodate her, a form of disability discrimination. After substantial

discovery, the clinic filed a motion for summary judgment to dismiss all claims. The trial

court granted the motion. In a written decision, the trial court listed twenty "undisputed

facts," including:

> 3. Prior to employment with the Clinic, Ms. Kries had surgery
> which left her with an open wound. Unbeknownst to the Clinic, Ms. Kries
> had this open wound from the time she began her employment through July
> 2010.
> 4. On July 14, 2010, Ms. Kries underwent surgery in an attempt to
> close the wound. This surgery resulted in drains being installed in the
> wound.
> . . . .
> 6. On July 27, 2010, Ms. Kries's treating physician gave written
> notice clearing her to return to work. Despite the treating physician's
> clearance, the Clinic refused to allow Ms. Kries to return to work based
> upon the criteria of the Infection Control Policy and the fact that Ms. Kries
> had a draining wound.
> . . . .

10. Based upon the wound being closed, the drains being removed, and the treating physician's clearance allowing Ms. Kries to return to work, the Clinic accepted Ms. Kries back to work. She was scheduled to return the following Monday, September 13, 2010. The weekend prior to her return to work, Ms. Kries suffered an infection and drains were again inserted.

11. On September 15, 2010, Ms. Kries presented another note to the Clinic from her treating physician but this note stated that drains had been inserted. Unlike the two previous notes, this note was not clearance to return to work.

12. Following this note, Ms. Kries failed to provide any subsequent documentation from her treating physician authorizing her to return to work.

. . . .

16. With the exception of the weekend of September 12, 2010, during Ms. Kries's entire employment with the Clinic, she had either an open wound or draining wound.

17. The Infection Control Policy and the Return to Work Policy are not in conflict with each other; the latter is a broad policy and the former narrows the scope based on safety concerns for patients and employees.

18. The Return to Work Policy expressly states that an employee with sutures or wounds that can be completely covered may be allowed to return to work.

19. The Infection Control Policy placed the contingency that the wound not be open or draining and also addressed the issue of pus forming skin infection.

20. While Ms. Kries may have been allowed to return to work with her wound covered, it was not a guarantee and was restricted by the Infection Control Policy.

CP at 483-85.

## LAW AND ANALYSIS

Shannon Kries assigns error to the trial court's (1) dismissing of her claim that the

Women's Clinic failed to provide her a reasonable accommodation, (2) concluding that

Kries' physical condition prevented her from establishing a prima facie case of failure to

15

provide a reasonable accommodation, (3) concluding that the infection control policy controlled and barred this suit, (4) ignoring the terms of the return to work policy, which allowed an employee to work with a covered wound, and (5) entering undisputed facts 3, 4, 6, 10, 11, 12, 16, 17, and 20. We conclude that material facts raise triable questions of: (1) whether the infection control policy, when read with the return to work policy, applied to bar the return of Shannon Kries to employment; (2) whether Shannon Kries bore an "open wound"; (3) whether the absence of an open wound is an essential job function of a medical assistant at the Women's Clinic; (4) whether the clinic's infection policy is a reasonable policy that trumps disability discrimination laws; and (5) whether the clinic reasonably accommodated Shannon Kries' disability. On any of these five grounds, reversal of the summary judgment dismissal is required.

We sing the standard refrain of summary judgment principles. This appellate court reviews a trial court's order granting summary judgment de novo. *Briggs v. Nova Servs.*, 166 Wn.2d 794, 801, 213 P.3d 910 (2009). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends in whole or in part. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008); *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974). In a summary judgment motion, the burden is on

the moving party to demonstrate that there is no genuine issue as to a material fact and that, as a matter of law, summary judgment is proper. *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985). This court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *Barber v. Bankers Life & Cas. Co.*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

## Findings of Fact

The trial court did not explicitly enter findings of fact, but listed twenty facts it concluded the parties did not dispute. Regardless of the labeling of the trial court's facts as findings or undisputed facts, we are not bound by them. Although Shannon Kries challenged some of the facts on the list, a challenge was unnecessary. Findings of fact and conclusions of law are inappropriate on summary judgment. *Oltman v. Holland Am. Line USA, Inc.*, 163 Wn.2d 236, 249 n.10, 178 P.3d 981 (2008); *Hemenway v. Miller*, 116 Wn.2d 725, 731, 807 P.2d 863 (1991). Findings of fact on summary judgment are not proper, are superfluous, and are not considered by the appellate court. *Chelan County Deputy Sheriffs' Ass'n v. County of Chelan*, 109 Wn.2d 282, 294 n.6, 745 P.2d 1 (1987).

## Infection Control Policy

The Women's Clinic claims its infection control policy barred Shannon Kries from a return to work. We first address whether the policy applied to Kries' circumstances. We also discuss whether the clinic's return to work policy modified the

strictures of the infection control policy. In a later section, we will assume that the infection control policy precluded Shannon Kries' return to work, and we will ask whether the policy violates disability discrimination law. We answer this additional question in order to identify for the parties other questions of fact for the jury to resolve on remand.

The infection control policy precluded an employee from working "with an open or draining wound." CP at 248. Neither the infection control policy nor the return to work policy defined "open" or "draining" wound. Note that open wound and draining wound are in the disjunctive under the policy.

The trial court concluded that, as a matter of law, Shannon Kries had both an open and draining wound within the meaning of the infection control policy. This conclusion was error.

Dr. Francis Riedo, Shannon Kries' well qualified expert on infectious disease, defined a "draining wound" as one that could not be contained and controlled. Stated differently, according to Riedo, a covered wound, with its drainage controlled, is not an open or "draining wound." Dr. Riedo noted redundancy in the infection control policy provision that referenced "open or draining wounds." According to Riedo, an open wound is always draining. Therefore, the term "draining wound" in the Women's Clinic infection policy must be narrowed, otherwise it adds no meaning to the policy. Since the infection control policy does not preclude working with a closed wound, Riedo reads the

18

policy to allow work with a closed wound that is draining, as long as the draining is contained and controlled. Therefore, Kries did not have an open or draining wound.

Dr. Michael Gillum, the Women's Clinic's expert and chair of the Deaconess Hospital Infection Control Committee, opined that any open wound was a "draining wound" and any sutured wound was a closed wound. Gillum's equating of an open wound with a draining wound is problematic since his testimony assigns no meaning to one of the disjunctive terms in the infection control policy. Although Gillum concluded that Shannon Kries wore an open wound, he contradicted himself when he characterized a sutured wound as a closed wound. Shannon Kries' wound was stapled and sutured.

The Women's Clinic's infection control policy was not strictly a contract. Nevertheless, the clinic used the policy as terms controlling the employment of Shannon Kries such that the policy may be treated as part of the employment contract.

The meaning of a contract provision is a mixed question of law and fact, because we ascertain the intent of the contracting parties by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of the interpretations advocated by the parties. *Berg v. Hudesman*, 115 Wn.2d 657, 666-67, 801 P.2d 222 (1990). On the one hand, when the facts are undisputed, such as when the parties agree that the contract language controls and there is no extrinsic evidence to be presented, courts may decide the issue as a matter of law.

*Trinity Universal Ins. Co. of Kansas v. Ohio Cas. Ins. Co.*, 176 Wn. App. 185, 202 n.8, 312 P.3d 976 (2013), *review denied*, 179 Wn.2d 1010, 316 P.3d 494 (2014). Summary judgment on an issue of contract interpretation is proper when the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning. *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 9, 937 P.2d 1143 (1997). On the other hand, the trial court should deny a summary judgment motion regarding interpretation of a contract provision when (1) the interpretation depends on the use of extrinsic evidence or (2) more than one reasonable inference can be drawn from the extrinsic evidence. *Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc.*, 120 Wn.2d 573, 582, 844 P.2d 428 (1993); *Berg v. Hudesman*, 115 Wn.2d at 668. Also, if two or more meanings are reasonable, a question of fact is presented. *GMAC v. Everett Chevrolet, Inc.*, 179 Wn. App. 126, 135, 317 P.3d 1074, *review denied*, 181 Wn.2d 1008, 335 P.3d 941 (2014).

In the case on appeal, the Women's Clinic has not identified the author of the infection control policy, who might enlighten a trier of fact as to the background and meaning of "open and draining wound" language. Michael Gillum approved the policy, but does not recall having done so.

Experts in infection control attach various meanings to the subject language. From a lay perspective, the differing interpretations are reasonable and raise an issue of fact for the trial court to resolve during the course of a trial, be it a bench or jury trial. Dr.

20

Riedo's testimony alone establishes a factual question, but inconsistencies in the testimony of Women's Clinic's witness also establish a question of fact.

Expert opinion on contract interpretation is usually inadmissible. *In re Tobacco Cases* I, 186 Cal. App. 4th 42, 51, 111 Cal. Rptr. 3d 313 (2010). Nevertheless, expert testimony may be admitted to assist a trier of fact in construing an ambiguity in a technical or scientific written instrument. *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998); *WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994); *Valley View Dev., Inc. v. United States ex rel. U.S. Army Corps of Eng'rs*, 721 F. Supp. 2d 1024, 1048 (N.D. Okla. 2010). Expert testimony can be used to explain the meaning of technical terms and words of art. *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 281-82 (5th Cir. 1987); *Mariner Energy, Inc. v. Devon Energy Prod. Co.*, 690 F. Supp. 2d 558, 571 (S.D. Tex. 2010), *aff'd*, 571 Fed. Appx. 226 (2013).

As a general proposition, courts do not permit expert testimony to construe or interpret the meaning of contract language. We conclude, however, that an exception to this general proposition applies to permit the trier of fact to entertain the testimony of the health care providers to construe the phrase "open or draining wound." The infection control policy contains medical language that deserves an exegesis from medical experts.

Language in the Women's Clinic's return to work policy conflicts with the language in the infection control policy, or at least the interpretation given by the Women's Clinic to the infection control policy. This discord also manifests an issue of

21

fact. The Women's Clinic's return to work policy allowed an employee not involved in patient care to return to work so long as she had "sutures or wounds that can be completely covered." CP at 445. Shannon Kries' primary tasks did not involve patient care. More importantly, Kries' supervisor could have returned Kries to tasks not involving any patient care, but for the Women's Clinic's allegiance to the ambiguous policy. The trial court determined that the infection control policy, as a specific policy, controlled over the return to work policy, a general policy. None of the language in either policy supports one policy's controlling over the other.

The Women's Clinic's confused application of its infection control policy also raises questions of fact. Sharyl Bergerud, director of infection control at Deaconess Hospital, testified that the Women's Clinic conducts an evaluation of an employee on a "case-by-case" basis to assess the status of a wound and, in turn, whether the employee may return to work. No one examined Shannon Kries' wound or drains to determine if restrictions would be appropriate and capable of allowing Kries to return to work in either a patient care or non-patient care position. Bergerud also attested that the clinic would need to review an employee with a permanent apparatus, such as a colostomy bag, on a "case-by-case basis" to determine whether the clinic could grant a workplace accommodation. Again, the Women's Clinic did not independently assess the danger, or lack thereof, of Shannon Kries' wound, but rather applied a per se exclusion. The Women's Clinic refused to consult with Shannon Kries' treating physician, Stephen

Olson.

The Women's Clinic return to work policy allowed an employee with a sealed wound in the forearm to return to employment. Dr. Michael Gillum, chair of the Deaconess Hospital Infection Control Committee and Women's Clinic expert witness, conceded that a sealed forearm wound posed a greater risk than Shannon Kries' abdominal wound.

As Shannon Kries correctly notes, the effect of employer policies and disclaimers is normally a question of fact for the jury. *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 534, 826 P.2d 664 (1992). Moreover, a disclaimer may be negated by inconsistent employer representations and practices. *Swanson*, 118 Wn.2d at 534. The clinic's staff admitted it had not conducted the same case-by-case analysis of Kries' wound promoted by its policy to conduct, even after Kries received multiple clearances from her doctor. Sharyl Bergerud admitted that no clinic document or writing existed to support the clinic's opinion about the order in which the two policies at issue here should be interpreted and applied with the infection control policy narrowing the scope of the return to work policy.

In short, vagaries, ambiguities, inconsistencies, and discrepancies raise issues of fact as to whether the Women's Clinic's infection control policy excluding "open and draining wounds" barred Shannon Kries' return to work either with or without accommodations. For this reason alone, the trial court's summary judgment dismissal of

23

Kries' suit was error. The rest of this opinion analyzes whether the facts preclude summary judgment on any of the other defenses to disability discrimination asserted by the clinic. They do not.

## Essential Job Function

The Women's Clinic contends that the ability to comply with its infection control policy is an essential function of any clinic job. The source, on which the Women's Clinic relies for establishing the essential job function, differs from the typical source. Most employers produce a job description that lists the essential job functions for discrete job titles. Nevertheless, the Women's Clinic did not file with the court any job description in support of its summary judgment motion. Instead the Women's Clinic depended on an infection control policy that presumably applies to every employee of the clinic.

An essential job function usually refers to the ability to perform a discrete task assigned by the employer to the worker's job position. Shannon Kries is capable of performing all of the tasks assigned by the clinic to a medical assistant. The clinic argues instead that Kries should not perform any tasks because of a danger she poses to patients of the clinic. We assume that the Women's Clinic argues that the absence of an open or draining wound is an essential job function of every job position at the clinic.

Perhaps in recognition of the awkwardness in relying on an essential job function argument, the Women's Clinic asserts the defenses of a safety based qualification

24

standard, business necessity, and direct threat to patients. We will address these defenses

later.

The Washington Law Against Discrimination (WLAD) provides, in part:

> It is an unfair practice for any employer:
>
> . . . .
>
> (2) To discharge or bar any person from employment because of . . .
> the presence of any sensory, mental, or physical disability . . .

RCW 49.60.180. The WLAD defines "disability" as:

> (a) . . . the presence of a sensory, mental, or physical impairment
> that:
> (i) Is medically cognizable or diagnosable; or
> (ii) Exists as a record or history; or
> (iii) Is perceived to exist whether or not it exists in fact.
> (b) A disability exists whether it is temporary or permanent,
> common or uncommon, mitigated or unmitigated, or whether or not it
> limits the ability to work generally or work at a particular job or whether or
> not it limits any other activity within the scope of this chapter.

RCW 49.60.040(7). The WLAD shall be construed liberally for the accomplishment of

the purposes thereof. RCW 49.60.020.

To survive summary judgment on her claim of discrimination, Kries must at a

minimum present evidence that: (1) she had a disability; and (2) she could perform the

essential functions of her job, with or without reasonable accommodations. *Davis v.*

*Microsoft Corp.*, 149 Wn.2d 521, 532, 70 P.3d 126 (2003); *Easley v. Sea-Land Serv.,*

*Inc.*, 99 Wn. App. 459, 468, 994 P.2d 271 (2000). The Women's Clinic agrees that, at

least for purposes of its summary judgment motion, Shannon Kries suffered from a

disability. Its own expert conceded the disability. The Women's Clinic, at least for purposes of summary judgment, does not deny it terminated the employment of Shannon Kries because of her disability. We focus now on whether the infection control policy imposed an essential job function.

The term "essential job function" is not found in the employment anti-discrimination statute, RCW 49.60.180. Thus the statute does not define the phrase. Rather, Washington courts have adopted the definition promulgated by the Equal Employment Opportunity Commission when interpreting the Americans with Disabilities Act (ADA), the federal counterpart to the Washington law against discrimination. *Davis v. Microsoft Corp.*, 149 Wn.2d at 533; *Herring v. Dep't of Soc. & Health Servs.*, 81 Wn. App. 1, 27 n.12, 914 P.2d 67 (1996). Washington courts have employed the federal definition to instruct juries on the meaning of "essential functions." *Easley v. Sea-Land Serv., Inc.*, 99 Wn. App. at 468.

". . . The term essential functions means the *fundamental job duties* of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the *marginal* functions of the position." 29 C.F.R. § 1630.2(n)(1) (2012) (emphasis added). Our Supreme Court elaborated by interpreting the term "essential function" as a job duty that is fundamental, basic, necessary, and indispensable to filling a particular position, as opposed to a marginal duty divorced from the essence or substance of the job. *Davis v. Microsoft Corp.*, 149 Wn.2d at 533 (citing

26

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 777 (3d ed. 1976)). "Job duties" are defined as "obligatory tasks, conduct, service, or functions enjoined by order or usage according to rank, occupation, or profession." *Davis v. Microsoft Corp.*, 149 Wn.2d at 533 (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 705 (3d ed. 1976)). The term "functions" or "job duties" cannot be construed simply as "tasks"; rather, the term "essential functions" must refer not only to the tasks and activities that are indispensable to the job, but also to the "conduct" and "service" required of the employee. *Davis v. Microsoft Corp.*, 149 Wn.2d at 533-34.

Shannon Kries could perform all functions of a medical assistant. The Women's Clinic worries about whether, in performing those functions, Kries may harm patients, but that possible harm was related to Kries' medical condition, not to her ability to perform discrete tasks assigned to the job.

A decision, on which the Women's Clinic relies, is *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007). *Bates* distinguishes between "essential functions" of a job and "qualification standards" for the position. Essential functions are basic duties. Qualification standards include personal and professional attributes that may include physical, medical, and safety requirements. In drawing this distinction, the court relied on definitions of the terms, under ADA regulations, found respectively in 29 C.F.R. § 1630.2(n)(1) and § 1630.2(q). A qualification standard applies to a person with a

27

disability who applies for a job and meets all selection criteria except one that he or she cannot meet because of a disability.

In *Bates v. United Parcel Service, Inc.*, hearing impaired applicants for a package driver position with United Parcel Service (UPS) sued under the ADA. UPS denied them employment because they failed a United States Department of Transportation (DOT) hearing test. The applicants prevailed in the trial court. On appeal, the applicants argued they satisfied the essential job functions of the position which were an ability to communicate with customers and safe driving. UPS contended that hearing at the level to pass the DOT test was an essential job function. Both the trial court and the Ninth Circuit rejected UPS' argument. The Ninth Circuit reversed and remanded because the lower court failed to make a finding that the applicants met the requirement of being a safe driver. In so ruling, the court noted that the determination of essential functions is a factual finding.

Shannon Kries at least establishes that there is a question of fact as to whether she meets the essential job function of a medical assistant. She may even conclusively establish this criteria. She worked in the position for three years, six months of which was with the Women's Clinic. The clinic's reliance on its infection control policy better fits under another pigeonhole of disability discrimination law.

Safety Based Qualification Standard

The Women's Clinic characterizes its infection control policy as a "safety based qualification standard." The clinic then contends that an employer may discharge an employee from employment because of a safety based qualification standard even though she has a disability so long as the standard (1) is job-related, (2) is consistent with business necessity, and (3) no reasonable accommodation exists. The clinic cites *Bates v. United Parcel Serv., Inc.*, 511 F.3d at 996 (9th Cir. 2007) for this proposition.

No Washington decision has adopted a safety based qualification standard as a defense in a disability discrimination case. No case adjudicating rights under Washington's law against discrimination has even employed the term. The defense, however, is similar in nature to Washington's bona fide occupational qualification (BFOQ) defense. A BFOQ defense is not available under the ADA. *Morton v. United Parcel Serv. Inc.*, 272 F.3d 1249, 1261 (9th Cir. 2001), *overruled on other grounds by Bates v. United Parcel Serv.*, 511 F.3d at 996. *Bates* couched the three-part test as the "business necessity" defense. *Bates v. United Parcel Serv., Inc.*, 511 F.3d at 996.

RCW 49.60.180(2) prohibits an employer from discharging an employee due to a disability, but the subsection allows no defense based on a bona fide occupational qualification. RCW 49.60.180(1) forbids the refusal to hire based on an applicant's disability, and the subsection creates a defense based on a bona fide occupational qualification. The section addressing discharge from employment omits any reference to the defense, whereas the section mentioning hiring expressly allows the defense. This

29

anomaly begs the question: did the legislature wish to deny the defense in a case where the employer discharges a disabled employee? The Women's Clinic terminated Shannon Kries' employment, rather than denying her application for employment. Why would the legislature distinguish from a wrongful discharge and wrongful refusal to hire case for purposes of the defense?

The relevant portion of RCW 49.60.180 reads:

> It is an unfair practice for any employer:
>
> (1) To *refuse to hire* any person *because of* age, sex, marital status, sexual orientation, race, creed, color, national origin, honorably discharged veteran or military status, *or the presence of any sensory, mental, or physical disability* or the use of a trained dog guide or service animal by a person with a disability, *unless based upon a bona fide occupational qualification*: PROVIDED, *That the prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved*: PROVIDED, That this section shall not be construed to require an employer to establish employment goals or quotas based on sexual orientation.
>
> (2) To *discharge* or bar any person from employment *because of* age, sex, marital status, sexual orientation, race, creed, color, national origin, honorably discharged veteran or military status, or *the presence of any sensory, mental, or physical disability* or the use of a trained dog guide or service animal by a person with a disability.

(Emphasis added.)

The court's duty in statutory interpretation is to discern and implement the legislature's intent. *Lowy v. PeaceHealth*, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012). We consider the statute's plain meaning by looking at the text of the provision at issue, as well as the context of the statute in which that provision is found. *State v. Jacobs*, 154

Wn.2d 596, 600, 115 P.3d 281 (2005). Courts should interpret statutes in a way that avoids a strained or unrealistic interpretation. *In re Pers. Restraint of Brady*, 154 Wn. App. 189, 193, 224 P.3d 842 (2010). Statutes should also be given a rational, sensible construction. *State v. Thomas*, 121 Wn.2d 504, 512, 851 P.2d 673 (1993).

We conclude that the defense of a bona fide occupational qualification is available to the employer in a discharge case in addition to a refusal to hire case. The legislature awkwardly drafted RCW 49.60.180. The legislature likely intended for the language in subsection (1) concerning a bona fide occupational qualification to carry over to subsection (2). The proviso that the disabled person be capable of proper performance of the job is also found in subsection (1), but not in subsection (2). Nevertheless, case law requires the worker to be capable to perform the job duties in both a wrongful discharge case and a refusal to hire case. *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 778, 249 P.3d 1044 (2011). The Supreme Court and this court has already applied the bona fide occupational qualification defense in a wrongful discharge case. *Brady v. Daily World*, 105 Wn.2d 770, 718 P.2d 785 (1986); *Rhodes v. URM Stores, Inc.*, 95 Wn. App. 794, 977 P.2d 651 (1999).

We see no reason to distinguish between a discharge case and refusal to hire case for purposes of the bona fide occupational qualification defense. The legislature may be more reluctant to allow the discharge from employment of a disabled worker than to allow a refusal to hire, since the discharged worker presumably has relied on his or her

31

job for months, if not years. Nevertheless, the employer deserves an employee capable of performing the job regardless if that person is a current employee or a potential applicant for employment.

Since we determined that the bona fide occupational qualification defense is available in this discharge suit, we must decide if the Women's Clinic established the defense as a matter of law. The Washington State Human Rights Commission promulgated a regulation that assists to a limited extent. The regulation reads, in relevant part.

> Under the law against discrimination, there is an exception to the rule that an employer . . . may not discriminate on the basis of protected status; that is if a bona fide occupational qualification (BFOQ) applies. The commission believes that the BFOQ exception should be applied narrowly to jobs for which a particular quality of protected status will be essential to or will contribute to the accomplishment of the purposes of the job. The following examples illustrate how the commission applies BFOQs:
>
> (1) Where it is necessary for the purpose of authenticity or genuineness (e.g., model, actor, actress) or maintaining conventional standards of sexual privacy (e.g., locker room attendant, intimate apparel fitter) the commission will consider protected status to be a BFOQ.
>
> (2) A 911 emergency response service needs operators who are bilingual in English and Spanish. The job qualification should be spoken language competency, not national origin.
>
> (3) An employer refuses to consider a person with a disability for a receptionist position on the basis that the person's disability "would make customers and other coworkers uncomfortable." This is **not** a valid BFOQ.
>   . . . .

WAC 162-16-240.

The Women's Clinic infection control policy intentionally excluded a class of

people with open wounds. The bona fide occupational qualification arises often when the employer intentionally excludes a class of disabled individuals from employment. The law is most wary of an employer's facial discrimination against a protected class. *Fey v. State*, 174 Wn. App. 435, 447, 300 P.3d 435 (2013), *review denied*, 179 Wn.2d 1029, 320 P.3d 720 (2014). In disparate treatment cases alleging facial discrimination, the employer's defense of a bona fide occupational qualification is narrowly construed. *Fey v. State*, 174 Wn. App. at 447.

Under federal law, to legitimately rely on a facially discriminatory qualification, the employer must either have a factual basis for believing that all or substantially all persons who lack the qualification would be unable to safely and efficiently perform the duties of the job, or be able to prove that some excluded employees would be unable to perform safely and efficiently and it is impossible or highly impractical for the employer to distinguish the employees who do or do not present the risk. *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 414, 105 S. Ct. 2743, 86 L. Ed. 2d 321 (1985). Washington courts have adopted this narrow construction of the bona fide occupational qualification defense to a claim of disparate treatment under the Washington's law against discrimination. *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 358, 172 P.3d 688 (2007); *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 326, 646 P.2d 113 (1982). Only a strong correlation supports a facially discriminatory bona fide occupational qualification. *Fey v. State*, 174 Wn. App. at 448. Otherwise, the law

33

requires that an employer couch job qualifications in neutral terms. *Fey v. State*, 174 Wn. App. at 448.

Several Washington cases have addressed employer policies that discriminated against disabled workers when the employer claimed the policy constituted a bona fide occupational qualification. A review of these cases shows that Shannon Kries raises a legitimate question of fact as to whether the Women's Clinic infection control policy suffices as a bona fide occupational qualification defense.

In *Tinjum v. Atlantic Richfield Co.*, 109 Wn. App. 203, 34 P.3d 855 (2001), a truck driver brought a discrimination action against an oil company, which refused to employ him because he was an insulin-dependent diabetic. The trial court concluded that Atlantic Richfield Company and Arco Products Company (ARCO) had an absolute defense to the handicap discrimination claim based on a federal regulation. Employers engaged in interstate commerce are prohibited by 49 C.F.R. § 391.41 from employing insulin-dependent diabetics as commercial truck drivers. This court reversed because the record was not sufficiently developed for a determination that the job Tinjum sought involved transporting petroleum in interstate commerce. If the position only involved transporting petroleum in intrastate commerce, ARCO did not have a defense to the handicap discrimination claim based on the federal regulation.

The *Tinjum* court did not expressly hold that ARCO could not sustain a bona fide occupational qualification defense without the federal regulation. Nevertheless, the court

34

cited federal cases in which a disabled employee, not the employer, was granted summary judgment on the defense.

In *Rhodes v. URM Stores, Inc.*, 95 Wn. App. 794, 977 P.2d 651 (1999), this court affirmed a summary judgment dismissal of George Rhodes' handicap discrimination claim against his former employer URM Stores. URM fired Rhodes from his job as a truck driver the second time he tested positive for controlled substances. This court held that the anti-drug policy expressed in the employment handbook was a reasonable safety precaution applicable to all of URM's employees and is thus a bona fide occupational qualification. The occupational qualification applied with added force with the inherent dangers in driving a truck on public roads while under the influence of mind-altering drugs.

In *Blanchette v. Spokane County Fire Protection District No. 1*, 67 Wn. App. 499, 836 P.2d 858 (1992), this court reversed a summary judgment order dismissing Edward Blanchette's handicap discrimination suit against a prospective employer, Spokane County Fire Protection District 1. The fire district relied on the Minimum Medical Standards for Firefighters in Washington Cities and Fire Districts to disqualify Blanchette from employment because he had Crohn's disease. The trial court ruled, as a matter of law, that the standards established a valid bona fide occupational qualification. One physician cleared Blanchette to work as a firefighter. The fire district's physician recommended that Blanchette not be hired because of Crohn's disease. The physician

based his recommendation on his belief that the medical standards excluded all persons with Crohn's disease from employment.

In *Blanchette*, we noted that, once the employee showed disability discrimination, the employer could defend itself by showing (1) the particular disability prevented the proper performance of the particular worker involved, or (2) a particular worker cannot satisfy a bona fide occupational qualification. We considered only whether the record conclusively demonstrated the medical standards established freedom from Crohn's disease as a valid bona fide occupational qualification. The fire district needed to prove that all or substantially all persons with Crohn's disease could not properly perform the duties of a fire fighter. Blanchette produced medical evidence contradicting the assumption in the medical standards that persons with Crohn's disease will suffer a debilitating recurrence of the disease, particularly if they have undergone surgery. Thus, genuine issues of material fact precluded summary judgment.

In *Rose v. Hanna Mining Co.*, 94 Wn.2d 307, 616 P.2d 1229 (1980), the Evergreen State high court also reversed a summary judgment order dismissing a claim of disability discrimination. The employer operated a ferro-silicon smelter plant, where Richard Rose applied for a job as a laborer. Hanna Mining denied Rose employment solely because he was afflicted with the condition of epilepsy. In a summary judgment order, the trial court found complete freedom from epilepsy to be a bona fide occupational qualification for working as a laborer in the smelter. The work area was

extremely hazardous, involving working around molten metal with a temperature as high as 3,240 degrees Fahrenheit. Among other dangerous functions, the laborer climbed ladders directly above semi-molten material at a temperature as high as 1,600 degrees Fahrenheit. According to a written company policy, Hanna Mining denied employment, except for office positions, to all persons with a history of "convulsive disorders." A list of "defects" expressly precluding employment included epilepsy.

Richard Rose experienced three grand mal seizures during his life, the last occurring seven years before applying for employment with Hanna Mining. He claimed his grand mal seizures were under control by medication. He admitted to lesser seizures which involved rapid eye blinking and nausea, but did not entail falling or convulsing. During these seizures, his activities were slowed for a few moments, but not interrupted. The seizures were preceded by a warning long enough and prominent enough to allow him to change his position before the seizure occurred.

Hanna Mining's physician testified that every epileptic was unsuitable for working as a general laborer at the smelter. In addition, this physician surmised an ever-present possibility that Rose might lose awareness and at times consciousness for a brief period such that he could not safely perform the job of laborer. The physician who testified for Rose, a specialist in epilepsy, disagreed. This second physician concluded that the working conditions would not tend to precipitate a seizure and that, because Rose has a warning before each seizure and does not have involuntary motor activity, Rose's

37

condition would not present a significant danger to himself or to others in the performance of any task, except for operating the overhead crane.

The *Rose* court noted the difference between an essential job function and a bona fide occupational qualification. The ability to do the job is part of the definition of disability discrimination; a bona fide occupational qualification is an exception to the rule of nondiscrimination because of disability. To assure that standard qualifications do not discriminate against applicants who can properly perform the work despite a handicap, the bona fide occupational qualifications must be narrowly drafted to describe the very minimum required. The employer must show that all or substantially all persons who do not possess the qualifications would not be able to perform the work safely and efficiently within the limits of reasonable accommodation. The Supreme Court held there to be a genuine issue of material fact as to whether substantially all persons with epilepsy could not perform the work safely.

Shannon Kries' case parallels *Rose*, *Blanchette*, and *Tinjum* rather than *Rhodes*. Kries forwards expert testimony that persons with wounds can safely serve as medical assistants. Indeed, the clinic's own policy admits that some wounds do not completely bar an employee from returning to work in either patient or non-patient care. Conversely, Kries thwarts, with admissible medical testimony, the Women's Clinic's position that all or substantially all persons with wounds cannot work at the clinic. The opinion testimony thwarts the clinic's position no matter if the wound is open or closed and no

matter how one defines "open wound."

Dr. Stephen Olson opined that, since Kries' clothing covered the wound and drains, she did not pose a risk to someone else. Kries would not infect any patients, as she had no active infection when she was cleared for work. Other employees at the clinic with similar wounds could also cover the wound to eliminate any risks to patients and coworkers.

Dr. Francis Riedo opined that Kries was not a risk to return to work as long as she covered the wound with an appropriate dressing and clothing and the wound was uninfected. Under such conditions, Kries posed no greater risk of transmitting infection from her wound or drain tubes to another person than anyone else in the workplace. Riedo observed that, under the Women's Clinic return to work policy, open or sutured wounds on the hands and forearms are not allowed. Therefore, open wounds on other areas of the body are allowed if they can be covered completely. According to Riedo, Kries could and did cover her wound completely and so was eligible to return to work in her regular job as a medical assistant.

Under federal law, the determination that an individual poses a "direct threat" to the safety of others must be based on an individualized assessment of the individual's ability to perform safely the essential functions of the job. 29 C.F.R. § 1630.2(r). The Women's Clinic applied a per se exclusion of Shannon Kries without individually analyzing her threat to others. Upon Kries' seeking a return to employment, the clinic

failed to contact or consult with Dr. Gillum, chair of the Infection Control Committee, or the medical director of employee health. The clinic refused to place Dr. Gillum in contact with Kries' treating physician, Stephen Olson.

Dr. Francis Riedo observed that, other than on September 13, 2010, the Women's Clinic took no cultures from Shannon Kries to establish if she was infected. Without cultures evidencing an infection, the clinic should have deferred to the treating surgeon's judgment and experience in releasing a patient to work. According to Riedo, a strict policy of no employment with an open or draining wound assumes incorrectly that every wound is infected and that no wound or body fluid can be effectively contained. This line of reasoning would by extension lead to a policy of preclusion from employment of anyone with a colostomy bag, periodontal disease, and even a woman during her menstrual cycle.

During his deposition, Dr. Michael Gillum, the clinic's expert, was asked if he would disagree if the Women's Clinic granted Shannon Kries a job with minimal patient contact. Gillum's only response was that Kries' return to work would violate employment policy. This response illustrates a close minded view of the clinic and its desire to apply stereotypes to an injured employee. Prohibitions against disability discrimination seek to rid the workplace of negative attitudes and practices toward the disabled that resemble those commonly applied to the underprivileged ethnic and religious minority groups. *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 278, n.2,

107 S. Ct. 1123, 94 L. Ed. 2d 307 (1987). On the one hand, a medical clinic should take extra precautions to prevent infection of patients. On the other hand, a medical clinic should take added steps to prevent discrimination of the wounded and disabled.

The Women's Clinic repeatedly told Shannon Kries that she needed to be fully healed in order to return to work. Federal courts have repetitively held that a policy of "100% healed" is a per se violation of the Americans with Disabilities Act. *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 699 (7th Cir. 1998); *Weigel v. Target Stores*, 122 F.3d 461, 466 (7th Cir. 1997); *Hutchinson v. United Parcel Serv., Inc.*, 883 F. Supp. 379, 396 (N.D. Iowa 1995); *Sarsycki v. United Parcel Serv.*, 862 F. Supp. 336, 341 (W.D. Okla. 1994).

Two federal cases examine concerns of an employee spreading an infection more serious than the nature of Shannon Kries' infection. In each case, the federal court reversed a summary judgment dismissal of a disability discrimination suit. Because our discrimination laws substantially parallel Title VII of the Civil Rights Act, we may look to federal law for guidance. *Phanna K. Xieng v. Peoples Nat'l Bank*, 120 Wn.2d 512, 518, 844 P.2d 389 (1993); *Washington v. Boeing Co.*, 105 Wn. App. 1, 8, 19 P.3d 1041 (2000).

In the first of the two decisions, *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987), the nation's high Court allowed a teacher with tuberculosis to proceed with an ADA claim despite the school district's fear that she may infect students with the

41

disease. The Court noted that allowing discrimination based on the contagious effects of a physical impairment would be inconsistent with the basic purpose of the ADA. Society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment. The Court wrote:

> The fact that *some* persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act *all* persons with actual or perceived contagious diseases. Such exclusion would mean that those accused of being contagious would never have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they were "otherwise qualified." Rather, they would be vulnerable to discrimination on the basis of mythology-precisely the type of injury Congress sought to prevent. We conclude that the fact that a person with a record of a physical impairment is also contagious does not suffice to remove that person from coverage under § 504 [ADA].

480 U.S. at 285-86. (footnotes omitted).

The second persuasive case involving an employee's risk of infection is *Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000). The city of Chattanooga denied Louis Holiday's application as a police officer because of his HIV infection. The city justified the denial of employment on the risk to coworkers and the public from blood to blood contact during police work. Holiday sued for disability discrimination under the ADA. The appellate court reversed a summary judgment dismissal granted to the city. The court held that Holiday was entitled to be evaluated based on his actual abilities and the relevant medical evidence and to be protected from discrimination founded on fear, ignorance or misconceptions.

42

The Women's Clinic emphasizes the nature of its business and appeals to the need to sterilize its premises from any infection. The clinic notes that it services pregnant women and provides postdelivery care to mothers and children who are highly susceptible to infection. It mentions a Centers for Disease Control and Prevention (CDC) report that hospital acquired infections pose significant threats to patients treated in healthcare institutions and add billions of dollars to healthcare costs. Another CDC report concludes that one out of twenty-five patients are infected as a result of care while at a hospital. The Women's Clinic highlights that Shannon Kries' position as lead medical assistant was classified as "Blood Borne Pathogen Exposure I," which means the position involved exposure to blood-borne pathogens. CP at 432. Exposure to blood-borne pathogens creates a risk of infection to both the patient and the healthcare provider. The Women's Clinic underscores Kries' duties as including direct patient interaction, including checking patients in, checking a patient's vitals, blood pressure and weight, and using syringes to give patients injections or take blood draws. Finally, the clinic notes that wounds cannot be effectively monitored for infection because of the delay between taking a wound culture and receiving test results.

The Women's Clinic expresses legitimate worries. But these concerns should be shared with the trier of fact. Sufficient evidence contradicts all of these dire worries such that a genuine issue of material fact exists as to whether freedom from wounds,

43

particularly when curbed as controlled by Shannon Kries, is a bona fide occupational qualification.

Business Necessity Defense

The Women's Clinic next relies on the business necessity defense as a shield to Shannon Kries' disability discrimination suit. RCW 49.60.180 omits reference to a business necessity defense. WAC 162-30-020(3)(b) adopts a business necessity defense in the context of discriminating against a pregnant woman. No Washington regulation applies this defense in other contexts of discrimination law.

When the employer couches occupational qualifications in neutral terms but the qualifications create a disparate impact on disabled persons, Washington cases have recognized "business necessity" as an affirmative defense for an employer responding to a disparate impact claim. *Shannon v. Pay 'N Save Corp.*, 104 Wn.2d 722, 730, 709 P.2d 799 (1985). As previously stated, the bona fide occupational qualification, not the business necessity, defense applies in disparate treatment cases. Because the clinic's infection control policy purposely discriminated against all workers with wounds, we decline consideration of the business necessity defense asserted by the clinic.

Another reason exists to decline application of the business necessity defense. The defense is indirectly covered through our bona fide occupational qualification analysis. In *Kastanis v. Educational Employees Credit Union*, 122 Wn.2d 483, 493, 859

P.2d 26, 865 P.2d 507 (1993), the state Supreme Court, in a marital discrimination suit,

analyzed the two defenses as if they were the same.

### Direct Threat

The Women's Clinic also mentions a defense of "direct threat." The ADA

contains language permitting an employer to exclude an applicant whose disability poses

a "direct threat" to others. Title 42 U.S.C. § 12113(a) provides:

> It may be a defense to a charge of discrimination under this chapter
> that an alleged application of qualification standards, tests, or selection
> criteria that screen out or tend to screen out or otherwise deny a job or
> benefit to an individual with a disability has been shown to be job-related
> and consistent with business necessity, and such performance cannot be
> accomplished by reasonable accommodation, as required under this
> subchapter.

Title 42 U.S.C. § 12113(b) further provides: "The term 'qualification standards'

may include a requirement that an individual shall not pose a *direct threat* to the health or

safety of other individuals in the workplace." (Emphasis added.) The term "direct

threat" is defined as a "significant risk to the health or safety of others that cannot be

eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). A slightly increased

risk is not enough, however; a "high probability" of substantial harm is required. *See*

APPENDIX TO PART 1630, INTERPRETIVE GUIDANCE ON TITLE I OF THE AMERICANS WITH

DISABILITIES ACT (2014). A speculative or remote risk is insufficient. 29 C.F.R. §

1630.2(r). The determination that an individual poses a "direct threat" must be based on

an individualized assessment of the individual's ability to perform safely the essential

functions of the job. 29 C.F.R. § 1630.2(r). The factors to consider in determining whether an individual poses a direct threat are: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r). The employer bears the burden of proving a worker is a direct threat. *Rizzo v. Children's World Learning Centers., Inc.*, 84 F.3d 758, 764 (5th Cir. 1996); *Equal Emp't Opportunity Comm'n v. Union Pac. R. R.*, 6 F. Supp. 2d 1135, 1138 (D. Idaho 1998).

Washington law has no similar provision concerning an employee's direct threat to others. We consider any such defense subsumed within the bona fide occupational qualification defense. Cases we discussed in our section on a bona fide occupational qualification included arguments by an employer that an employee's disease, including infections, posed a direct threat to the public, customers, and coworkers. Thus, we decline to discuss this argument further.

Reasonable Accommodation

An employer holds a duty to reasonably accommodate the disability of an employee. Shannon Kries alleges that the Women's Clinic violated this duty.

To establish a prima facie case of failure to reasonably accommodate a disability, a plaintiff must show that (1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the

employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality. *Davis v. Microsoft Corp.*, 149 Wn.2d at 532 (2003); *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 192-93, 23 P.3d 440 (2001), *overruled on other grounds by McClarty v. Totem Electric*, 157 Wn.2d 214, 137 P.3d 844 (2006). We have already concluded that Shannon Kries suffered a disability and that an issue of fact exists as to whether Kries could perform the essential functions of a medical assistant. Kries may have withheld information from the Women's Clinic upon hire as to her wound. Nevertheless, she testified she mentioned the wound to others at the clinic when hired. More importantly, the clinic possessed knowledge of the wound months before Kries' termination from employment. We must now decide whether some facts show that the clinic failed to adopt available measures to accommodate Kries' disability.

The clinic contends that it held no obligation to offer Shannon Kries a reasonable accommodation because her open and draining wound posed an unacceptable risk of infection no matter what job position she held within the facility. As already analyzed and determined, questions of fact exist as to whether Kries' wound posed an unacceptable risk. Some medical testimony rejects the clinic's position.

The Women's Clinic also contends that Shannon Kries failed to present the clinic with a valid return to work form after September 15, 2010. Although, Dr. Stephen Olson

agreed that the form he signed did not expressly authorize a return to work, a reasonable person could read the form to impliedly have authorized a return. The note was on a return to work form. The clinic also forgets that Dr. Olson called on October 5, 2010, to inform it that he cleared Kries to return to work. Finally, the clinic's contention is hypertechnical since it would not allow Kries back to work unless a physician determined that Kries was fully healed and since Olson's authorizations were worthless.

The Women's Clinic fired Shannon Kries on November 16, 2010. The clinic blames the termination from employment on Kries because she failed to communicate with the clinic. Nevertheless, the clinic could have contacted her or her physician to determine the progress of her healing. Her physician had already approved her reemployment.

The clinic's expert, Dr. Michael Gillum, concludes that Shannon Kries could have returned to work on November 30, only two weeks after the firing. The clinic could have left Shannon Kries' job position open and temporarily filled the position with another worker until Kries recovered. The Women's Clinic commendably provided Kries some medical leave, but presents no facts that providing additional leave would have been a burden. Providing unpaid medical leave can qualify as a reasonable accommodation. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir. 2001); *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998). A question of fact exists as to whether allowing Kries further leave would be a reasonable accommodation.

48

Reassignment is another method of accommodation. *MacSuga v. Spokane County*, 97 Wn. App. 435, 442-44, 983 P.2d 1167 (1999). Facts show that Shannon Kries' supervisor had work and was willing to allow Kries to work at duties that did not require contact with patients. The Women's Clinic rejected this accommodation because of an unyielding infection control policy. Questions of fact exist as to whether the reassignment would be a reasonable accommodation.

An employer must reasonably accommodate an employee's disability unless to do so would impose an undue hardship on the employer's business. WAC 162-22-075. "Undue hardship" is an employer's last defense; one that it may assert when an otherwise qualified employee could ordinarily be reasonably accommodated but cannot in a particular case, based on typically case-specific circumstances. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 402, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002). An accommodation is reasonable only if its cost is not clearly disproportionate. *Stone v. City of Mount Vernon*, 118 F.3d 92, 98 (2d Cir. 1997). The Women's Clinic presents no evidence that assigning tasks to Shannon Kries that did not involve patient contact increased its expenses.

## Attorney Fees

Shannon Kries requests attorney fees and costs under RAP 18.1(b) and RCW 49.60.030. RAP 18.1 permits a party to recover attorney fees on appeal if an applicable law grants the party that right. RCW 49.60.030(2) provides, in relevant part:

Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees or any other appropriate remedy.

Although the WLAD allows for an award of attorney fees on appeal, Kries'

request here is premature, as the trial court has not ruled on the merits. *Sambasivan v.*

*Kadlec Med. Ctr.*, 184 Wn. App. 567, 592, 338 P.3d 860 (2014); *Dowler v. Clover Park*

*Sch. Dist. No. 400*, 172 Wn.2d 471, 485-86, 258 P.3d 676 (2011). Therefore, we deny

the request.

## CONCLUSION

We reverse the trial court's grant of summary judgment dismissal to the Women's

Clinic. We remand the suit for further proceedings. Shannon Kries' request for an award

of reasonable attorney fees and costs will abide the determination of whether Kries

prevails on the merits.

_____
Fearing, J.

I CONCUR:

_____
Brown, A.C.J.

50

32879-1-III

KORSMO, J. (dissenting) — Like the trial court, I see nothing ambiguous about the infectious disease policy and the fact that Shannon Kries has an expert who prefers a different policy does not render the Clinic's policy ambiguous. But, even under her own interpretation of the policy, she had a draining wound for the last several months of her employment and had not been cleared to return to work. I therefore dissent from those aspects of the majority opinion and need not address the other contentions.

The basic principles that govern this inquiry are well settled. Whether a contract is ambiguous is a question of law for the court to determine. *McGary v. Westlake Investors*, 99 Wn.2d 280, 285, 661 P.2d 971 (1983). Courts will not read an ambiguity into a contract "where it can reasonably be avoided by reading the contract as a whole." *Id.* An ambiguity exists if language is "'fairly susceptible to more than one reasonable interpretation.'" *Mendoza v. Rivera-Chavez*, 88 Wn. App. 261, 268, 945 P.2d 232 (1997) (quoting *Tewell, Thorpe & Findlay, Inc. v. Contintental Cas. Co.*, 64 Wn. App. 571, 575, 825 P.2d 724 (1992)).

The "Infection Control Policy" lists six "general guidelines." Clerk's Papers (CP) at 436. The first of those is that "No one is allowed to work with an open or draining wound."

The second[1] guideline provides: "Hospital employees reporting to work, involving patient care or food service, with sutured lacerations on hands or forearms will not be allowed to work until the sutures are removed or until affected areas can be washed thoroughly. All sutures, other than on hands and forearms, must be covered during working hours." *Id.*

Similarly, the return to work policy expressly states that "No sutures or open wounds on hands or forearms" will be allowed in direct patient care. CP at 445. However, employees may, by approval, work in patient care areas with "Sutures or wounds that can be completely covered, other than hands/forearms (i.e. chest, leg, face)." *Id.*

The general guidelines and the return to work policy do not conflict in the least. The first general guideline speaks to an "open or draining wound." The second general guideline covering sutures and the return to work policy are the same—no wounds or sutures on the hands or forearms, but sutures on the rest of the body are permitted if they can be covered. The policies of the first two guidelines complement each other and do not conflict. The first policy addresses draining wounds, while the second addresses non-draining closed wounds. Stated simply, the Clinic's rules were: no open wounds, no draining wounds, no sutured wounds below the elbow, and sutured wounds other places might be all right if they could be covered.

---

[1] The other general guidelines address employees with elevated temperatures, contagious upper respiratory infections, those who become ill at work, and those with infectious diseases. CP at 436.

2

While the phrase "open or draining wound" could be clearer, it is not ambiguous, despite Ms. Kries' efforts to redefine the phrase to create an ambiguity. Both her expert, Dr. Francis Riedo, and defense expert Dr. Michael Gillum agreed that all open wounds were, technically speaking, draining wounds.[2] CP at 360, 371, 374. Dr. Riedo also agreed with the Clinic's policy—an employee should not work with an open or draining wound. CP at 360. Indeed, he had the same policy. CP at 361. He also agreed that no employee with forearm wounds should work. CP at 363. His disagreement with the Clinic's "open wound" policy was that it did not address draining wounds that could be adequately covered.[3] CP at 360. Thus, he thought the Clinic's policy should be reinterpreted to permit people whose wounds could be adequately covered, or whose draining could be contained, to work. CP at 360.

This is a mere policy disagreement between experts; it is not an ambiguous policy. Dr. Riedo believed the policy was over inclusive, but he had the same understanding of what an open or draining wound was as the Clinic did. He thought that an exception for adequately covered wounds (or controlled drainage) would sufficiently serve the purposes of the policy. However, that was not his decision to make. The fact that the

---

[2] Curiously, the majority opinion at page 19 faults the defense expert for equating open wounds with draining wounds, but does not fault the plaintiff's expert for having the same view.

[3] "What's unspoken is what if you can cover the wound? It doesn't say no one is allowed to work with a covered wound." CP at 360.

3

"open wound" policy did not address covered wounds did not mean that the policy was ambiguous.[4]

The majority's effort to find ambiguity in the phrase "open or draining wound" likewise fails. It reasons that because "an open wound is always draining," that "Therefore the term 'draining wound' in the Women's Clinic infection policy must be narrowed, otherwise it adds no meaning to the policy." Majority at 18. That reasoning is unsound for at least two reasons. First, while all "open wounds" may be draining, it does not necessarily follow that all draining wounds are "open wounds."[5] Ms. Kries' own example demonstrates the problem. While her skin wound was "closed," she continued to have draining due to internal infections. Her own expert agreed that she had two drains in place. CP at 360. By her argument, she may no longer have had an "open wound," but admittedly she still had a "draining wound." The two terms are not co-extensive.

The second reason the majority's argument fails is that, even if the two terms were co-extensive, there is no basis for "narrowing" the meaning of only one of two terms that have the same meaning. The outcome of that exercise would be, as here, to continue to have the same problem the majority was trying to fix. Instead, the purpose of interpreting language in a contract is to "determine the parties' intent at the time of contracting" in

---

[4] In fact, the suture policy dealt with covered wounds that were not draining wounds.

[5] Just because all dogs are mammals, does not mean that all mammals are dogs.

order "to give effect to the apparent clear intention." *Eurick v. Pemco Ins.*, 108 Wn.2d 338, 340-41, 738 P.2d 251 (1987). Contracts are interpreted to give effect to all provisions. *Smith v. Continental Cas. Co.*, 128 Wn.2d 73, 80, 904 P.2d 749 (1995). Interpreting "draining wound" to have the same meaning as "open wound" would render, quite unnecessarily, one of those two phrases meaningless in contravention of our obligation to give meaning to both.

Instead, if we meet our obligations to avoid ambiguity and give effect to both phrases, as well as consider the other provisions of the contract, the answer is clear. The disputed provision prohibits an "open wound" and it also prohibits a "draining wound." Giving "draining wound" its own meaning means that we cannot interpret that phrase to only apply to an "open wound." Instead, it must mean a draining closed wound, such as the closed wound that afflicted Ms. Kries. Closed wounds that are not draining would be covered by the suture policy.

Here, Ms. Kries had, by her own admission, a closed wound that was draining. Her condition fell squarely within the "open or draining wound" policy because the existing suture policy left draining wounds to the "open or draining wound" policy. Because there is no ambiguity and because Ms. Kries fits within the policy, the trial court properly granted summary judgment.

Medical care facilities by definition address many patients who are themselves ill and also at increased risk of developing infections from others. Putting them together with

5

other ill patients or health care employees who themselves are ill significantly increases the risk of new infections to patients and employees alike. The Clinic adopted a policy of limiting the risk of infection for both patients and employees. Dr. Riedo presented evidence of a different approach that he considers more balanced. That there might be a different reasonable policy does not mean that the Clinic's approach is unreasonable or discriminatory. The Clinic worked with Ms. Kries after she disclosed her condition, and employed her for nearly 11 months even though she was off work much of that period due to the fact that her condition would not heal.[6] The Clinic's treatment of her, consistent with its employee infection policy, was entirely reasonable.

The most that Ms. Kries has shown is that, in some circumstances, the phrase "open or draining wound" is redundant. However, redundancy is not ambiguity. There are reasonable alternative policies, but not alternative reasonable readings of this policy. I, accordingly, would affirm the order granting summary judgment, and respectfully dissent.

Korsmo, J.

---

[6] It is very possible to view Ms. Kries' continuing infection difficulties as proof of the wisdom of the Clinic's policy, although perhaps not of its efficacy.